## JOYCE v. STEUART, Inc.
### Civ. A. 5118.

United States District Court,
District of Columbia.
May 20, 1954.

Ford, Bergson, Adams, Borkland & Redstone, Washington, D. C. (Albert F. Adams and Daniel J. Freed, Washington, D. C.), for plaintiff.

Whiteford, Hart, Carmody & Wilson, Washington, D. C. (Harry L. Ryan, Jr., and Duane G. Derrick, Washington, D. C.), for defendant.

WILKIN, District Judge (by designation).

This controversy arose out of war conditions and the scarcity of materials during the war and thereafter. The basis of the plaintiff's claim is an agreement between plaintiff as an associate dealer and the defendant as a direct dealer in De Soto and Plymouth motor vehicles. The agreement (Plaintiff's Exhibit No. 1) was entered into the 22nd day of May, 1940. At that time the supply of motor vehicles exceeded the demand. It is evident that the parties did not foresee or make any provision for such scarcity of motor vehicles as was brought about by the war. The agreement is silent as to the number of vehicles which the associate dealer could buy and the direct dealer would supply. If the supply of automobiles had continued as it was when the agreement was made, it seems certain that there would have been no controversy between the plaintiff and defendant.

During the abnormal market conditions, which followed this country's engagement in the second World War, the plaintiff, like other automobile dealers, was unable to obtain enough motor vehicles to fill the orders which he had received from his customers. He no doubt suffered a severe loss of business and profits. He tried to minimize such loss and, no doubt, made diligent effort to obtain more motor vehicles from the defendant, his source of supply, as direct dealer.

His complaint alleges that such efforts resulted in subsequent agreements which bound the defendant, as direct dealer, to supply plaintiff with more cars than he actually received, and he seeks damages from the defendant because of the defendant's failure to supply motor vehi-

cles in accordance with the alleged subsequent agreement.

The defendant denies that there was any subsequent agreement, and alleges that all claims and demands of the plaintiff against the defendant, based upon the original agreement of May 22, 1940, or otherwise, were cancelled and settled by the termination agreement, entered into by the defendant and the plaintiff on the 31st day of May, 1949 (Defendant's Exhibit No. 6).

When the defendant was confronted by the shortage of motor vehicles, it adopted the policy and practice of allotting to each associate dealer, dependent on it for supplies, a certain percentage of the vehicles which it received from the manufacturer. Such policy, together with the percentage, which each dealer was to receive, was set forth in an address by Mr. Steuart to associate dealers on April 29, 1947 (Plaintiff's Exhibit No. 3).

Plaintiff alleges that in consideration of his increasing his sales—and garage-plant and equipment, the defendant, through L. P. Steuart, promised to increase his percentage from 4 to 9; that such increase was effective for a while, and then was decreased by the defendant, contrary to his alleged promise to the plaintiff. The evidence is clear that there was conversation between the parties, as to the plaintiff's plant and equipment, from time to time, and that the plaintiff's capacity was one of the factors in determining his percentage of cars. There is no evidence, however, that any percentage was fixed for a definite time. Furthermore, by the terms of the original contract, the plaintiff was obligated to maintain plant and equipment sufficient to care for the business in his territory.

Except for the testimony of the plaintiff, the evidence does not support his claim or his allegations as to any agreement subsequent to the original of May 22, 1940. The testimony of other witnesses, and the records of the company, show that the percentages allowed to associate dealers were fixed, and adjusted from time to time, by the defendant, mainly through the action of the executive vice-president as a voluntary method of distributing available cars, but it was not by agreement with the plaintiff or any other associate dealers. The weight of the evidence indicates that there was no agreement to maintain any percentage for any specified time.

The plaintiff admitted that his alleged subsequent agreement was not reduced to writing, although the original contract provided:

"No representative of either party, except as herein explicitly provided, has any authority to waive any of the provisions of this agreement or to modify or change any of its terms, and no change, addition or erasure of any printed portion of this agreement (except filling in of blank spaces and lines) shall be valid or binding upon either party."

The evidence is clear that in October of 1948, the defendant reduced the plaintiff's allotment from 9 to 5 percent. Consideration of all the evidence constrains the court to find that the defendant had a right to determine the number of cars the plaintiff and other associate dealers should receive. A supplement to the original agreement, entitled Terms of Purchase, was made by the parties (Plaintiff's Exhibit No. 2), and paragraph 4 of that document provides:

"Direct dealer shall have the right to accept, in whole or in part, any or all orders received, and shall not be liable for any loss or damage resulting from its failure to ship or deliver goods ordered."

The plaintiff contends that the establishment of definite percentages was equivalent to the acceptance of orders, and that the reduction of any percentage by the defendant was a breach of contract. Plaintiff supports this contention by citing Wood Motor Co., Inc. v. Nebel, 150 Tex. 86, 238 S.W.2d 181. In that case the finding of breach of contract was based upon the failure of the direct dealer to deliver "one associate dealer's proportionate share of new automobiles."

In this case, however, the evidence reveals that the plaintiff received his fair proportion of automobiles distributed to associate dealers. The plaintiff's percentage was as high as, or higher than, other associate dealers in his class. The plaintiff's ratio with the defendant's retail sales department was not maintained, but the change there was due to the change of sales policy by the manufacturer. The manufacturer, in reply to the defendant's insistent demands for more automobiles, told the defendant that it would have to reduce its allowances to associate dealers.

Plaintiff alleges also that the decrease by defendant of his allotment as an associate dealer carried over to, and controlled, his allotment as a direct dealer. Such allegation is also unsupported by the evidence. When plaintiff became a direct dealer, his contract was with the manufacturer, and established an entirely new and different arrangement. The number of vehicles he had received and sold was, no doubt, one of the factors considered by the manufacturer in determining his allowance of cars, but it was not controlling. The manufacturer was free to allow the plaintiff any percentage of the available supply, and did fix the plaintiff's allowance by other considerations. The defendant can not be held accountable, after termination of contract, for what the manufacturer did. The case cited by plaintiff, Wood Motor Co., Inc. v. Nebel, syllabus 5, supports this holding.

There is one other question which this case presented, and to which the court has given careful consideration. The plaintiff and defendant were engaged in a joint enterprise for the sale of De Soto and Plymouth motor vehicles. The original contract provided:

"Associate dealer and direct dealer agree to do business together and thus to facilitate associate dealer's purchases and resale of De Soto and Plymouth products."

It stated further that:

"It is direct dealer's aim to have a fair, mutually helpful and friendly business association exist between associate dealer and direct dealer."

The question is, Did the defendant fairly fulfil that part of the agreement? It is beyond question that the defendant was obligated to supply motor vehicles to the plaintiff. Regardless of the failure of the plaintiff to sustain his allegations regarding subsequent agreements for specific percentages, the defendant was bound by the terms of the original contract to act in good faith with the plaintiff, and supply to him and other associate dealers a fair proportion of available vehicles. The evidence convinces the court that the defendant met that requirement of the contract. The defendant called a meeting of all associate dealers, explained the conditions, and stated the percentage allotment which each dealer should receive (Page 20, Plaintiff's Exhibit No. 3).

The plaintiff complained of no breach of contract prior to October, 1948. Shortly prior to that time, the manufacturer changed its sales policy and reduced the number of the associate dealers to be supplied by the defendant. As a result, the number of motor vehicles which the defendant received was reduced, and defendant was constrained to reduce the allotment which had been established for the plaintiff. But the defendant maintained the former ratio between associate dealers.

In view of all the testimony, especially the testimony of former officers of the defendant company, who are not now associated with the defendant, the court is unable to say that the conduct of the defendant toward the plaintiff at that time was unfair or unjust. The agreement between the parties, and the working arrangement, placed the direct dealer in competition with his associate dealers to some extent. That fact was accepted by the parties. The arrangement did not create that kind of fiduciary relation or trusteeship which forbids any self-interest or self-consideration. In view of the unexpected developments resulting from the war, the nature of the contract which the parties made, and the

change of sales policy by the manufacturer, it was permissible for the defendant to consider its own preservation in business. In the circumstances, all that the plaintiff could do was what he ultimately did—become a direct dealer himself. He cannot impose upon the defendant all the losses which he suffered as a result of conditions for which neither party was responsible, and as to which their contract made no provision.

■ Furthermore, the termination agreement (Defendant's Exhibit No. 6), in the opinion of the court, is fatal to plaintiff's claims. An agreement terminating a former contract terminates all claims based on the former contract, unless exceptions are expressly made. In this instance, there were no exceptions. The former contract, and all claims arising therefrom, came to an end when the termination agreement was executed on the 31st day of May, 1949—that was its purpose. Juniper Lumber Co. v. John M. Nelson, Jr., 133 Va. 146, 112 S.E. 564, 24 A.L.R. 247; Durasteel Co. v. Great Lakes Steel Corp., 8 Cir., 1953, 205 F.2d 438.

The plaintiff's claims, therefore, can not be sustained. Complaint dismissed at costs of plaintiff.